


UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF PHILADELPHIA BOARD OF PENSIONS AND RETIREMENT, LEWIS WILDER and NORTH BORDER PARTNERS, | CASE NO. |
| Plaintiffs, | |
| v. | |
| STEPHEN M. CASE, MICHAEL KELLY, GERALD LEVIN, DANIEL F. AKERSON, KENNETH J. NOVACK, STEPHEN F. BOLLENBACH, FRANKLIN D. RAINES, FRANCIS T. VINCENT, JR., JAMES L. BARKSDALE, FRANK J. CAUFIELD, CARLA A. HILLS, REUBEN MARK, ROBERT W. PITTMAN and R.E. TURNER, | |
| Defendants. | |
| and | |
| TIME WARNER, INC., a Delaware corporation, and AMERICA ONLINE, INC., a Delaware corporation, | |
| Nominal Defendants. | |

SHAREHOLDER DERIVATIVE COMPLAINT



## **COMPLAINT**

Plaintiffs, by their attorneys, based upon personal knowledge as to their own acts, and upon information and belief as to all other matters, submit this Complaint against the defendants named herein derivatively on behalf of Nominal Defendant, Time Warner, Inc.

## **NATURE OF THE ACTION**

1.      Plaintiffs bring this action pursuant to Federal Rule 23.1 derivatively for the benefit of nominal defendant Time Warner, Inc. ("new Time Warner" or the "Company"), and

double derivatively for the benefit of nominal defendant America Online, Inc. ("America
Online"). Until October 16, 2003, new Time Warner was known following the merger of
America Online and Time Warner, Inc. ("old Time Warner") as "AOL Time Warner, Inc." This
action is brought against certain current and former officers and members of their Boards of
Directors of these entities to remedy defendants' breaches of fiduciary duties which ultimately
caused and continues to cause damages to new Time Warner.

## SUMMARY OF THE ACTION

2.      In January 2000, America Online and old Time Warner first announced the
historic merger (the "Merger") that would create new Time Warner a year later. At the time the
Merger was announced, defendants, as well as Wall Street, considered America Online's
advertising and commerce business to be crucial to the combined Company's growth. The
principal terms of the Merger were negotiated in a short meeting between defendants Case and
Levin without any serious investigation and due diligence being conducted by either company of
the other. Indeed, utilizing their respective investment bankers, Smith Barney and Morgan
Stanley, Messrs. Case and Levin directed their subordinates to contract with such firms to
perform pro forma due diligence investigations so as to enable the bankers to present sham
fairness opinion letters to the respective Boards of Directors before each board "rubber stamped"
the terms of the Merger a bare two days later. Each of the directors of both companies knew or
should have know that these opinion letters and the fictitious due diligence investigations were
shams but nevertheless recklessly approved the Merger without significant debate or thought.

3.      A few months into 2000, but well before the Merger was effected, America
Online began to see even stronger evidence of a major slowdown in its online advertising
business due to, among other things, the failing financial health of many of its advertisers.

2

America Online, with the knowledge, approval, and/or acquiescence of its then senior management and directors (some of whom are named as defendants here), reacted by manipulating advertising transactions, and the manner in which America Online accounted for them, in an effort to maintain the appearance of growth.

4.    By the time the Merger closed in January 2001, defendants, including former executives of old Time Warner, knew or consciously disregarded that America Online's online advertising and commerce business was in serious trouble. Nonetheless, they not only allowed the Merger to close under the original, unfavorable terms, but also they approved and/or acquiesced in the unabated continuation and expansion of the program of manipulating advertising transactions and accounting and revenue recognition practices after the Merger to support the Company's public claims of strong growth by the new combined entity.

5.    Meanwhile, from July 2000 to May 2001, certain defendants capitalized on their knowledge of the Company's true financial condition by selling millions of shares of America Online and new Time Warner common stock, thereby reaping hundreds of millions of dollars in illicit personal proceeds.

## PARTIES

6.    Plaintiff City of Philadelphia Board of Pensions and Retirement ("Philadelphia") is the official pension fund for public employees, retirees and their survivors of the City of Philadelphia, Pennsylvania. It is a Pennsylvania citizen. Philadelphia held shares of America Online continuously since at least December 31, 1998 until January 11, 2001 when those shares were converted by merger into shares of new Time Warner. Philadelphia is and has been the owner of shares of America Online and then new Time Warner common stock since prior to the

wrongs herein complained of and continuously to date. As of March 2006, Philadelphia held approximately 220,000 shares of new Time Warner stock and still retains the shares.

      7.      Plaintiff Lewis Wilder is a citizen of Florida and has held shares of new Time Warner continuously at all times relevant hereto.

      8.      Plaintiff North Border Partners is a partnership and a citizen of Florida and has held shares of new Time Warner continuously at all times relevant hereto.

      9.      Nominal Defendant Time Warner, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal executive offices located at One Time Warner Center, New York, NY 10019. New Time Warner is a fully integrated, Internet-powered media and communications company that was formed as a result of the merger of American Online and old Time Warner, which was consummated on January 11, 2001 ("the Merger Date"). America Online and old Time Warner became wholly owned subsidiaries of new Time Warner. The Company's business includes: America Online, consisting principally of interactive services, Web properties, Internet technologies and electronic commerce services; Cable, consisting principally of interests in cable television systems; Filmed Entertainment, consisting principally of interests in filmed entertainment and television production; Networks, consisting principally of interests in cable television and broadcast network programming; Music, consisting principally of interests in recorded music and music publishing; and Publishing, consisting principally of interests in magazine publishing, book publishing and direct marketing. On July 18, 2002, following the resignation of Defendant Robert W. Pittman, formerly the Company's Chief Operating Officer, the Company undertook a significant restructuring, in which the previous chairman of the Time Inc. magazine division was named chairman of a newly formed Media Group that included AOL and Time Warner Cable as well as

the books and magazine divisions, and the previous chairman of HBO was named chairman of a newly formed Entertainment Division that includes television networks, film and television studios, and music.

10.    Nominal Defendant America Online, Inc. is a wholly-owned subsidiary of new Time Warner and prior to the effective date of the Merger was an independent publicly-owned company organized under the laws of the State of Delaware.

11.    Defendant Daniel F. Akerson ("Akerson") was a member of new Time Warner's Board of Directors until he resigned on March 28, 2003, and also served as a member of the Board's Audit and Finance Committee. Defendant Akerson served as a director of America Online from 1997 until the Merger Date when he joined the new Time Warner Board. He also served as a member of America Online's Audit Committee in 1998 and 1999. Akerson is believed to be a citizen of New York.

12.    Defendant James L. Barksdale ("Barksdale") is and was, during the relevant time, a member of new Time Warner's Board of Directors. Defendant Barksdale served as a director of America Online from March 1999, when America Online acquired Netscape, until the Merger Date when he joined the new Time Warner Board. Barksdale is believed to be a citizen of Mississippi.

13.    Defendant Stephen F. Bollenbach ("Bollenbach") is a member of new Time Warner's Board of Directors and Chairman of the Board's Audit and Finance Committee. Defendant Bollenbach served as a director of old Time Warner from 1997 until the Merger Date when he joined the new Time Warner Board. Bollenbach is believe to be a citizen of Connecticut.

14.     Defendant Stephen M. Case ("Case") served as Chairman of new Time Warner from the date of the merger until May 2003 when he resigned as Chairman but remained a member of the Board. Defendant Case, a co-founder of America Online, served as Chief Executive Officer of America Online from 1993 and as Chairman of its Board from 1995 until his appointment as Chairman of the Board of new Time Warner on the Merger Date. Case is believed to be a citizen of New York.

15.     Defendant Frank J. Caufield ("Caufield") is a member of new Time Warner's Board of Directors. Defendant Caufield served as a director of America Online from 1991 until the Merger Date when he joined the new Time Warner Board. Prior to the Merger, Caufield had served as a member and one-time Chairman of America Online's Audit Committee, and after the merger was a member of new Time Warner's Audit and Finance Committee. Caufield is believed to be a citizen of Massachusetts.

16.     Defendant David M. Colburn ("Colburn") was Senior Vice President of Business Affairs for America Online from 1995 until the Merger, and afterwards was Executive Vice President and President of Business Affairs and Development at America Online, a unit of deal makers within America Online that negotiated and finalized many of its largest transactions, until he was terminated in August 2002. In his positions, Colburn was America Online's and new Time Warner's chief deal-maker. Colburn was directly involved in negotiating and reporting advertising deals between America Online and its customers, including many "dot.com" startups — which had assumed growing importance, as advertising and commerce revenue accounted for up to a third of America Online's revenues by the fall of 2000 — which resulted in the misreporting of advertising revenues. Colburn reported directly to Defendant Robert W. Pittman. Colburn was terminated in August 2002 after being identified as a subject of

6

investigations being conducted by the Securities and Exchange Commission and the United States Department of Justice. Colburn is believed to be a citizen of Maryland.

17.    Defendant Carla A. Hills ("Hills") is a member of new Time Warner's Board of Directors. Defendant Hills served as a director of old Time Warner from 1993 until the Merger Date when she joined the new Time Warner Board. Hills is believed to be a citizen of Connecticut.

18.    Defendant J. Michael Kelly ("Kelly"), who joined America Online in 1998, was a Senior Vice President, Chief Financial Officer and Assistant Secretary of America Online from 1998 until the Merger. After the Merger, Kelly served in various executive positions at new Time Warner and its subsidiaries, including as Chief Financial Officer and Executive Vice President of new Time Warner and also served as a member of the Board of Directors until he resigned from the Board on December 20, 2004. Kelly signed off on all of the Company's major deals and its financial reports until December 2001, when he was demoted to chief operating officer of America Online. Kelly directly attested to the health of advertising and commerce revenue, and signed off on the accounting for all major transactions. Kelly is believed to be a citizen of Virginia.

19.    Defendant Reuben Mark ("Mark") is a member of new Time Warner's Board of Directors. Defendant Mark served as a director of old Time Warner from 1993 until the Merger Date when he joined the new Time Warner Board. Mark is believed to be a citizen of New York.

20.    Defendant Kenneth J. Novack ("Novack") is a member of new Time Warner's Board of Directors. Defendant Novack served as Vice Chairman of America Online from May 1998 and as a director of America Online from January 2000 until his appointment as Vice

Chairman of the Company on the Merger Date. He served as Vice Chairman of the Board of Directors from that time through December 2003. Novack is believed to be a citizen of Massachusetts.

21.     Defendant Robert W. Pittman ("Pittman") served as Co-Chief Operating Officer and a director of the Company from the date of the Merger until July 18, 2002 when he resigned. During a portion of the time after the Merger, Pittman also had continuing responsibilities for operations of America Online. Prior to the Merger Defendant Pittman had served at various times as President and Chief Executive Officer of subsidiaries or divisions of both old Time Warner and America Online, including President and Chief Executive Officer of Time Warner Enterprises and AOL Networks. Pittman is believed to be a citizen of California.

22.     Defendant Franklin D. Raines ("Raines") was a member of new Time Warner's Board of Directors until he decided not to stand for re-election to the Board of Directors at the Company's 2004 annual meeting, and also served as a member of the Board's Audit and Finance Committee. Defendant Raines served as a director of America Online and a member of its Audit Committee from September 1998 until the Merger Date when he joined the new Time Warner Board. Raines is believed to be a citizen of New York.

23.     Defendant Robert E. Turner ("Turner") served as Vice Chairman of new Time Warner Board of Directors until 2003 and continues to serve as a Member of its Board. Defendant Turner served as Vice Chairman and a director of Time Warner from the consummation of Time Warner's merger with Turner Broadcasting System, Inc. in October 1996 until his appointment as Vice Chairman and Senior Advisor of the Company on the Merger Date. Turner is believed to be a citizen of Georgia.

24.    Defendant Francis T. Vincent Jr. ("Vincent") is a member of new Time Warner's Board of Directors and member of the Board's Audit and Finance Committee. Defendant Vincent served as a director of Time Warner from 1993 until the Merger Date when he joined the new Time Warner Board. Vincent is believed to be a citizen of Connecticut.

25.    Defendants Akerson, Bollenbach, Raines and Vincent are referred to herein as the "Audit and Finance Committee Defendants." As members of the Company's Audit and Finance Committee during the time period in issue, it was the function of the Audit and Finance Committee Defendants to recommend to the Board the engagement of the Company's independent auditors. Pursuant to the Committee's Charter, its responsibilities included: the review of (i) the professional services provided by and independence and qualifications of the Company's independent auditors; (ii) material changes in accounting policies and financial reporting practices and material developments in financial reporting standards in consultation with the independent auditors and management; (iii) the plan and scope of the annual external audit as recommended by the independent auditors; (iv) the adequacy of the Company's internal accounting controls and the results of material internal audits in consultation with the independent auditors and the Company's chief internal auditor; (v) the Company's financial statements and the results of each external audit in consultation with management and the independent auditors; (vi) the auditing and accounting principles and practices to be used in the preparation of the Company's financial statements in consultation with the Company's independent auditors and the Company's principal financial officer and principal accounting officer; and (vii) the financial structure, condition and strategy of the Company, including making recommendations with respect thereto and approving such matters that are consistent

with the general financial policies and direction from time to time determined by the Board of Directors. The Audit and Finance Committee also oversees the Company's compliance program.

26.    Defendants Case, Colburn, Kelly and Pittman are referred to herein as the Officer Defendants. As persons who held executive positions with new Time Warner or its America Online or Time Warner subsidiaries during some or all of the time when the events occurred that gave rise to the claims in this action, the Officer Defendants owed duties of care, competence and undivided loyalty to the Company and its shareholders under applicable legal standards.

27.    Defendants Akerson, Barksdale, Case, Caufield, Kelly, Novack and Turner were at relevant times Directors who personally benefited from their wrongdoing by engaging in transactions in the securities of America Online, old Time Warner and/or new Time Warner and are referred to herein as the Selling Director and Officer Defendants.

28.    All of the Defendants other than the nominal defendants new Time Warner and America Online are referred to collectively as the Individual Defendants.

## JURISDICTION AND VENUE

29.    Jurisdiction of the Court is based upon the diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

30.    Venue is proper in this District because the Nominal Defendants have their headquarters here, each of the Individual Defendants is or was during the relevant period located and/or regularly conducted business here and much of the wrongdoing alleged herein occurred here.

10

## SUBSTANTIVE ALLEGATIONS

31.     The claims in this action arise from, *inter alia*, the reckless and failed Merger, false and misleading statements that induced the Merger, including materially false financial statements and sham "fairness" opinion letters from the investment banking firms hired by the Nominal Defendants' senior management, which misconduct continued after the Merger to hide its failure, the ensuing consequences, and the Individual Defendants' causation thereof.  Indeed, the full extent of the misrepresentations concerning the assets, reported earnings and net worth of Nominal Defendant new Time Warner and American Online, both before and after the Merger, remains obscured, and further restatements and write-offs of assets relating to the conduct set forth herein may yet be announced.

### The Increasing Importance of, and the Prospects of a Sharp Decline in, Online Advertising Revenue

32.     The events that ultimately gave rise to the present action began late in 1996, when America Online, which was facing stiff competition from other Internet service providers — which is what America Online was at the time — abandoned the fee-for-time pricing model, in favor of a flat monthly fee.  Usage skyrocketed, taxing America Online's system and reducing its margins.  Searching for revenue, America Online looked to selling advertising on its network. By 2000, the Company's reported ad and commerce revenue — which were collectively reported on a single line in the Company's accounting reports — had risen to $2 billion, accounting for a third of America Online's total reported revenue.  During the same period, the stock price rose dramatically, from below $10 to $60 and above.

33.     As The Washington Post reported in a series of articles published in July 2002, America Online knew as early as the year 2000 that the growth in its advertising revenues could

11

not be sustained in light of the failure, or at least the struggling condition, of many "dot-coms,"

which were the principal source of much of America Online's advertising revenues.

34.    By the fall of 2000, America Online was holding emergency meetings to address

the problem America Online faced with the prospect of decreasing ad revenues going forward.

America Online's management did everything it could — including recording as "advertising

and commerce" revenues from questionable "round-trip" transactions — to meet analysts'

projections and appear to be continuing its growth, thereby allowing America Online to meet

Wall Street's expectations. If the former AOL defendants had not taken these actions to produce

this "revenue," there would have been a material negative impact on the price of America

Online's stock.

35.    While the price of America Online's stock remained artificially high, unaffected

by the as yet undisclosed prospect of much lower ad revenues, America Online acquired Time

Warner, a company with many valuable properties, but with limited Internet penetration. The

Merger, which was effected in January 2001, was promoted for its supposed synergies and cross-

marketing opportunities, which never materialized. Instead, America Online's reduced ad

revenues caused the combined Company to bleed revenue, and the Company's management

failed to put in place the joining of forces that was to have created the synergies promoted in the

merger. Meanwhile, Company executives bailed out, making insider sales of over 5 million

shares, generating proceeds of $255 million.

**Manipulations to Overstate America Online's**
**Revenue and its Consequences for the Company Following the Merger**

36.    Throughout the period after the recklessly negotiated and approved Merger, the

Company issued a series of positive public statements about its business and prospects. In

January 2002, the Company announced that it would be writing down the value of goodwill in

12

the $40-$60 billion range to implement new accounting standards, but it was not until April 24,

2002, that it revealed that a $54 billion reduction in goodwill resulted primarily from the decline

in new Time Warner's stock price. The Company also announced in April for the first time that

its ad revenues had declined sharply. Investigative reports in The Washington Post and other

sources later revealed revenue gimmicks that had been employed to meet the Company's

numbers. For example, in addition to the $49 million in overstated revenues that the Company

has since admitted — which include a so-called "round-trip" transaction with WorldCom — The

New York Times reported on the creation of the iPlanet partnership with Sun Microsystems and

a related "round-trip" transaction with Sun that resulted in AOL booking $350 million for

licensing, marketing and advertising in exchange for AOL purchasing $500 million in equipment

and services from Sun at full list prices — when 30 - 40% discounts were typical in the industry

— which also were likely used to bolster AOL's reported results.

      37.     The Securities and Exchange Commission and the Department of Justice both

conducted investigations of the Company's practices. However, the Company and the

Defendants repeatedly denied any misconduct or sought to downplay the significance of these

investigations.

      38.     The New York Times described the then current state of the government

investigations and the Company's dealings with Sun Microsystems in a September 1, 2002,

article entitled: "Ouster at AOL, but Where Does Trail End?," as follows:

> One question at issue, people involved with both the S.E.C. and internal
> inquiries have said, is whether AOL might have overstated its results by
> trading goods or services with other companies at inflated prices and
> recording the prices as revenue. The practice is known as round-tripping
> because money paid out as an expense effectively comes back, recorded as
> sales and artificially bolstering the top line. It is an especially thorny issue
> for AOL because the company prided itself on doing reciprocal business

13

— for example, selling advertising to many of its telecommunications and technology suppliers. . . .

In one part of the deal, Sun agreed to pay AOL more than $310 million a year as part of a three-year partnership called iPlanet. AOL treated the payments as recurring revenue until last January, when AOL Time Warner announced that the partnership would not continue. In a simultaneous deal, AOL agreed to buy $500 million in computer equipment from Sun at list price, even though companies like AOL usually buy at a discount of more than 30 percent. In turn, Sun agreed to pay AOL $350 million in licensing, marketing and advertising fees, raising the possibility that AOL was effectively getting back some of its expenditures to bolster its own revenue.

39.     The Company at first dismissed the allegations in the articles as amounting to small potatoes and that "accounting for the questionable transactions differently would have had no impact on the Company's net income." Nonetheless, on the morning of July 18, 2002, when the Company announced the departure of Defendant Colburn, who had headed the business affairs division of the Company's American Online unit, it conceded — in the face of investigations by the Securities and Exchange Commission and the Department of Justice — that contrary to its repeated representations that its accounting was sound, three transactions (one with WorldCom and two others with then-undisclosed entities) totaling $49 million may have been inappropriately recognized, and that it was reviewing other transactions as well.

40.     As a result of its investigations, on October 23, 2002, the Company announced a restatement of its financial results for each quarter ended September 30, 2000 through June 20, 2002 and for the years ended December 31, 2000 and December 31, 2001. The total impact of that restatement was to reduce the Company's consolidated advertising and commerce revenues not by $49 million but by *$190 million*, of which $168 million in reduced revenues was attributable to America Online, and the remaining $22 million represented a reduction in revenues from certain transactions related to the America Online Division in which the

14

advertising was delivered by other new Time Warner divisions. However, this restatement did not correct all of the improper round-trip transactions that had been recorded by the Company, and its financial statements remained materially deficient. In March 2005, the Company was forced to take a second restatement, totaling approximately $500 million, in connection with the alleged accounting improprieties.

41.    Even this almost $700 million in restatements did not constitute the sole consequence of defendants' misconduct. The investigations conducted by the Department of Justice and the Securities and Exchange Commission resulted in significant sanctions, thereby underscoring the importance of the defendants' breaches of fiduciary duty in failing to ensure that the Company managed its affairs properly and in compliance with all applicable legal requirements. As set forth below, these investigations confirmed serious misconduct at the Company and underscored the materiality of its impact on new Time Warner and America Online.

42.    In the wake of the disclosures, more than 20 class action lawsuits were commenced in at least three different federal courts on behalf of investors who purchased Company stock (or stock of the predecessor companies) during various periods from as early as July 19, 1999, to as late as August 24, 2002.

43.    On August 3, 2005, the Company issued a press release announcing that it had reached an agreement in principle to settle the primary securities class action for a *$2.4 billion* payment by new Time Warner, to be supplemented by $150 million previously paid to the Department of Justice that will be made available to the securities class, and the Company's commitment to use its "best efforts" to transfer the $300 million previously paid to the SEC to the class settlement fund as well.

## Issues Relating to Advertising and Other Revenues

44.     As set forth above, the Company was formed via the Merger between America Online and Time Warner consummated in January 2001. Near the height of the Internet boom in the late 1990's, America Online used its soaring stock price to acquire Time Warner, an "old-media" company with four times its revenue. The Company's share price has fallen substantially since the Merger because, *inter alia*, of the fact that one of the much touted benefits of the Merger -- promised synergies from the combination of old and new media -- simply failed to materialize in any meaningful manner. Never disclosed to the market, however, was the fact that in the face of their knowledge and/or conscious disregard of America Online's longstanding and pervasive ad revenue problems and the overall bleak picture for the online ad revenue market, as repeatedly projected internally for the Company going forward, defendants had no good faith basis to believe that the promised synergies would, in fact, ever materialize as promised. As alleged herein, both before and after the Merger, information regarding AOL's online advertising business and the amount of revenues derived therefrom was crucial to investors because the combined America Online/Time Warner was supposed to grow largely from synergies between Time Warner's old media business and production of media content and America Online's ability to deliver such media content via the Internet and derive revenue from such delivery, including through the sale of online advertising.

45.     By late 2000, dot-com companies were collapsing in increasing numbers. Many commentators began to question the viability of the online advertising business model. Illustrative of Defendants' improper conduct in breach of their fiduciary duties, when asked about what appeared to be a recession in the online advertising business in October 2000, America Online's then President, Defendant Pittman, defended the strength of the business: "I

16

don't see it, and I don't buy it." According to a July 18, 2002 <u>Washington Post</u> article, however, at the time Pittman was making these representations, he and the other AOL defendants had already repeatedly been warned that America Online faced the risk of losing over $140 million in advertising revenue the next year. AOL's internal estimates showed it was likely to lose $23.2 million in advertising revenue in the first quarter of 2001, and $140 million in the full fiscal year. These adverse facts were never disclosed.

46.    On July 15, 2002, amid revelations of accounting irregularities and restatements at companies such as WorldCom and Adelphia Communications, <u>The New York Times</u> reported that investors were concerned that the Company's accounting might not reflect the Company's true financial state. A Company spokesman, Edward Adler, defended the Company's accounting, and stated: "Our free cash flow generation is actually strong," he said, "and our capitalization policies are conservative, not only in accordance with GAAP."

47.    On July 18, 2002, the Company disclosed a shakeup in its management and that Defendant Pittman would resign from the Company. A Company press release quoted Richard Parsons, then the Company's Chief Operating Officer, as stating that the Company had adopted a new operating structure and made senior leadership appointments.

48.    In the Company's news release announcing the resignation of Defendant Pittman, defendants took the opportunity to re-emphasize their claims of a successful future for the Company, stating:

> We have the best media, entertainment and communications businesses in the world, but our challenge-and our goal in making these changes-is to take the lessons we've learned over the past two years and use them to make the parts work together to create greater value for our shareholders.

49.    On July 18 and 19, 2002, <u>The Washington Post</u> published a series of articles reporting potential problems with accounting practices and controls at the Company. The

articles focused on alleged transactions and manipulations at the Company that had the effect of boosting or accelerating advertising revenue in the face of a declining trend in advertising. Company officials cited in the July 18, 2002 article disclosed that the America Online unit of the Company boosted revenue from a series of unconventional deals from 2000 to 2002, both before and after the merger of America Online and old Time Warner. Sources attributed in that article revealed that Business Affairs personnel referred to these transactions as "BA specials."

50.     In the article, The Washington Post further reported that Robert O'Connor, formerly Vice President of Finance for America Online's advertising division, stated that he had raised questions internally about the activities of and deals completed by Business Affairs. The article revealed that O'Connor stated he repeatedly outlined his concerns in a series of meetings in 2001 and 2002 with Defendants Pittman, then President of America Online, Defendant Colburn, President of Business Affairs, and other high ranking officials. O'Connor is quoted as stating: "clearly a lot of what they were living on was revenue that was not of the highest quality. I don't know if they're still in denial, but there were some pretty big business issues they were not willing to face. For months, I tried to get these guys out of denial. I tried to take the perfume off the pig."

51.     O'Connor left the Company in February 2002 after reportedly continuing to raise questions about advertising inventory and subsequently being told that his future at the Company was not bright.

52.     The Washington Post articles of July 18 and 19, 2002 further disclosed, citing Company documents and former executives, that America Online might have effectively inflated its revenue, in part by reporting some fees from advertisers to end contracts without disclosing that the fees would not be recurring. In another example, the articles disclosed that America

Online reportedly recognized sales of advertising on behalf of eBay as part of its own revenue. The Company had entered into an agreement with online auctioneer eBay to sell advertisements for eBay. Thus, America Online functioned as eBay's advertising broker. The Company did not take title to the products it sold for eBay, and was not contractually required to pay eBay the full sum due for the sale of such advertising in the event eBay customers did not pay for the advertising. Rather, eBay retained the risk that customers who bought eBay advertisements from America Online salespeople would not pay for the ads.

53.     According to The Washington Post article of July 18, 2002, however, an internal Company document stated that the Company "recognizes all revenue generated from eBay inventory sales on a topline basis." In short, the Company did not just take the usual advertising representative's commission, but counted eBay's revenue as its own.

54.     The Washington Post July 18, 2002 article also reported the Company's strenuous denials that there was any inappropriate accounting of America Online's transactions, quoting the Company's official response as stating, "The accounting for all of the transactions The Washington Post has discussed with AOL was appropriate and in accordance with GAAP [Generally Accepted Accounting Principles]. The disclosures in AOL's financial statements were also appropriate and accurate."

55.     On July 25, 2002. The New York Times reported that the Company had disclosed that the SEC had begun an investigation into accounting irregularities at its America Online division. As set forth above, less than three months later, this resulted in the restatement of financial results for every quarter ending September 30, 2000 through June 30, 2002, as well as for the years ended December 31, 2000 and December 31, 2001, with the interim write-off of $190 million in revenues.

56.    The then pending SEC investigation was, in fact, only the latest in a long series of SEC investigations relating to accounting irregularities at America Online.  On May 15, 2000, the SEC, with America Online's consent, issued a Cease-and-Desist Order, captioned *In the Matter of America Online, Inc., Respondent*, Administrative Proceeding File No. 3-10203, which concluded that America Online had improperly accounted for advertising expenditures, and as a result, reduced its pretax losses by approximately $77 million.  The SEC concluded that if America Online had properly reported these advertising expenditures, it would have caused America Online to report losses, rather than profits, for six of the eight quarters at issue in its investigation.

57.    Under the terms of the Cease-and-Desist Order, America Online was fined $3.5 million.

58.    As a result of the SEC's prior investigation and Cease-and-Desist Order, defendants, including but not limited to the Audit and Finance Committee Defendants, were charged with knowledge of both the importance of accurate accounting for advertising and the sensitivity of the SEC to this issue.

59.    Regarding the current accounting irregularities, the Company repeatedly claimed that its accounting firm, Ernst & Young ("E&Y"), had reviewed the suspect transactions and had said the Company's accounting was proper.

60.    On July 26, 2002, the price of the Company stock closed down $1.76 per share, or 15%, to $9.64 per share, sinking to a 52 week low after the Company disclosed that the SEC had opened an inquiry into its accounting practices.

61.    The report of the accounting probe prompted several brokerage firms and analysts to voice concern and downgrade the Company's stock.

20

62.     On August 1, 2002, The New York Times reported that on July 23, 2002 the United States Department of Justice had begun an investigation into accounting practices at the America Online division.

63.     In response to the Justice Department Investigation, the Company stated: "Our accounting is appropriate and in accordance with generally accepted accounting principles, and our auditors, Ernst & Young, have repeatedly confirmed that."

64.     The Wall Street Journal further reported on August 1, 2002 that the Department of Justice and the SEC had ordered the Company to preserve documents. The article stated:

> While the total amount of revenue in the transactions was relatively small – about $270 million, or less than 1% of AOL's total 2001 revenue – the deals may have helped America Online mask a deterioration in its advertising business before the merger. After the merger with Time Warner, which closed early last year, the online-advertising business began to crumble. But in each of the two years prior to the merger, dramatic growth in ad revenue helped America Online to increase its profits sharply.

65.     On the same day, The New York Times stressed the materiality of the accounting issue, despite the Company's protestations that they accounted for only a small portion of its revenue:

> . . . the timing of the transactions is significant because they took place when the company was under pressure to show that its revenue was holding up even though many of its dot-com advertising clients were collapsing. Around the same time, AOL used its soaring stock price to acquire Time Warner, a company with four times its revenue. Since that time, AOL's advertising revenue has in fact plummeted, and, to shareholders' chagrin, its poor performance has become the biggest drag on the combined company's stock.

66.     The news of the investigations by the SEC and the Justice Department served to underscore the materiality of the integrity of the Company's accounting to the market and its shareholders. The Washington Times quoted one analyst as explaining, "In this environment,

any probe has got to be taken quite seriously . . . . I think this is a situation like termites. You never know how bad the danger is until the professional inspector gets in there." Another analyst ominously noted that while the investigators so far appear to be focusing on accounting practices at the America Online division, "we are not 100 per cent sure the investigation is contained purely at [that] division."

67.    On August 2, 2002, The Wall Street Journal reported that federal regulators were investigating the complex relationship between the Company's America Online division and a small Las Vegas software company called PurchasePro.com Inc. ("PurchasePro").

68.    An arrangement between PurchasePro and America Online dated back to March 2000. At that time, PurchasePro agreed to pay $20 million toward co-developing software with America Online and to spend $50 million on marketing that software. The two agreed to share the revenue generated by the software sales. America Online and PurchasePro entered into an agreement whereby America Online would sell software for PurchasePro in exchange for performance warrants of PurchasePro. America Online booked the value of the PurchasePro performance warrants as advertising and commerce revenue, even though the warrants represented merely a right to purchase PurchasePro stock at a certain price, a right that it might never exercise. Defendant Colburn labeled this revenue inflating transaction as a "science fiction" deal.

69.    Former PurchasePro executive Charles Johnson commented on America Online's revenue booking and said, booking the equity sales as advertising revenue seemed strange. "They were selling software [for PurchasePro] and they got warrants for selling it," he said. "I don't know how those become ad revenues."

22

70.    In fact, the SEC filed a complaint that concluded that the transactions with PurchasePro constituted fraudulent "round-trip" transactions designed to boost the company's online advertising revenue to mask the fact that it was experiencing a business slow-down. The SEC also determined that these and other similar transactions served to aid and abet the frauds of PurchasePro and other public companies, including Homestore, Inc., as described below.

71.    On August 5, 2002, The Wall Street Journal reported that a lawsuit had been filed by the California State Teachers' Retirement System alleging that Homestore, Inc. had boosted revenue through complex third-party transactions involving the Company. The suit, captioned *T. Jeffrey Simpson v. Homestore. Com, Inc.*, No. 01-CV-11115 (C.D. Cal. filed Dec. 27, 2001), did not name the Company as a defendant, but it claimed that the Company was a party to the transactions. Company executives, including Defendant Colburn, were also reported to have been questioned by the SEC in connection with the Homestore matter. A Company spokesman said its auditors, E&Y, had reviewed and approved the accounting related to Homestore.

72.    The Homestore lawsuit pointed to at least one revenue-boosting transaction involving SFX Technology and America Online. According to the lawsuit, a director of business development at Homestore called a friend at SFX and agreed to have Homestore pay $2.03 million in cash to purchase a license for the use of "worthless technology" during the first quarter of 2000. The cash expenditure was recorded on the balance sheet as a technology asset. SFX then allegedly bought $2 million in advertising on America Online, keeping $30,000 for itself. America Online then gave $1 million of the $2 million it received from SFX to Homestore, through a revenue-sharing advertising agreement it had with Homestore. This allegedly allowed Homestore to recognize $1 million in revenue without disclosing that the revenue cost $2.03 million. The complaint states that the SFX transaction was one of many third-party revenue-

23

boosting arrangements at Homestore. "The money is circulated through AOL," said Bruce Simon, a San Francisco attorney at Cotchett, Pitre, Simon & McCarthy representing the plaintiff in the Homestore litigation.

73.    An August 16, 2002 <u>Wall Street Journal</u> article disclosed that regulators were focusing on the Company's alleged "round-trip" transactions. This practice occurs when a company sells an unused asset to another company while at the same time agreeing to buy back the same or similar assets at about the same price. The result of this potentially illegal accounting practice is to artificially inflate revenue of both the buyer and the seller, neither of which has been required to pay for anything. The article further revealed that Company officials told <u>The Wall Street Journal</u> that on August 5, 2002 an employee in Business Affairs approached a Company attorney about a potentially improper transaction that the Company had booked as advertising and electric commerce revenue. According to <u>The Wall Street Journal</u>, the Company's attorneys further investigated that deal, and realized it was troubling, and the Company stated that subsequent investigation led its attorneys to find three other questionable transactions.

74.    On August 23, 2002, <u>The Wall Street Journal</u> reported that the biggest portion of $49 million in questionable advertising revenue then under investigation at the Company involved money that was inappropriately booked from WorldCom Inc. This article revealed that the money stemmed from the particularly close relationship America Online and WorldCom developed during the past few years, in which the Company became WorldCom's biggest customer, paying the telecommunications firm at least $900 million a year to carry the bulk of its Internet traffic. In July 2001, the two companies struck a massive deal in which WorldCom

24

agreed to buy more than $200 million in advertising across Company properties in exchange for the America Online continuing to keep its network traffic on WorldCom's network.

75.    On August 26, 2002, The Wall Street Journal reported that the Company had invested $30 to $50 million in Oxygen Media Inc. a women-focused cable channel that would be carried by the Company's cable systems. At the same time Oxygen agreed to buy about $100 million in ads that mostly ran on AOL – a hefty amount for a start-up company. The article further stated that the Company's internal investigators are scrutinizing scores of deals involving the America Online unit – including the one with Oxygen Media Inc.

## The Results of the Government Investigations

76.    The Department of Justice investigation resulted in the filing of a criminal complaint against America Online for the actions of its employees in connection with securities fraud committed by PurchasePro.com, the deferral of criminal prosecution, payment of a *$60 million* penalty and establishment of a *$150 million* restitution fund.

77.    The SEC investigation resulted in the filing of a civil complaint charging new Time Warner with materially overstating online advertising revenue and the number of its Internet subscribers, and with aiding and abetting three other securities frauds, and violating a prior SEC Cease-and-Desist Order issued to America Online, an injunction against future violations of certain securities laws. As a result of the investigation, new Time Warner consented to entry of a judgment requiring it to pay a *$300 million* penalty, to comply with the SEC's May 15, 2000 Cease-and-Desist Order against America Online, enjoined the Company from aiding and abetting securities fraud, and agreed to restate its historical financial results to reduce its reported online advertising revenues by approximately $500 million (in addition to $190 million that had already been restated) for the fourth quarter of 2000 through 2002 and to

25

properly reflect the consolidation of AOL Europe in the Company's 2000 and 2001 financial statements.

78.    In a separate proceeding, three senior executives of new Time Warner, including Chief Financial Officer Wayne H. Pace, consented to the entry of a SEC Cease-and-Desist Order that found that they had caused reporting violations by the Company in accounting for $400 million paid to the Company by Bertelsmann AG in two sets of transactions.

### Massive Insider Sales By The Individual Defendants

79.    In the months immediately before and after the Merger, the Selling Director and Officer Defendants, with knowledge and/or conscious disregard of material non-public information regarding America Online, and after the Merger new Time Warner, sold over 12 million shares of America Online, old Time Warner, and new Time Warner common stock at materially inflated prices, reaping total proceeds in excess of $600 million, including the following:

(a)    Between July 24, 2000 and May 2, 2001, Defendant Case sold 3 million shares of America Online and new Time Warner common stock, garnering in excess of $156 million.

(b)    Between July 24, 2000 and April 19, 2001, Defendant Novack sold 793,000 shares of America Online and new Time Warner common stock, garnering almost $39 million.

(c)    Between July 24, 2000 and May 8, 2001, Defendant Barksdale sold 1,852,250 shares of America Online and new Time Warner common stock, garnering in excess of $91.5 million.

(d)    Between August 5, 2000 and April 30, 2001, Defendant Caufield sold 150,000 shares of America Online and new Time Warner common stock, garnering in excess of $8.5 million.

(e)    With two sales, on February 15 and May 14, 2001, Defendant Turner sold 1,343,344 shares of new Time Warner common stock, garnering in excess of $68 million.

(f)    Between July 24, 2000 and May 7, 2001, Defendant Pittman sold 1,894,745 shares of America Online and new Time Warner common stock, garnering in excess of $94.5 million.

(g)    Between August 28, 2000 and April 25, 2001, Defendant Akerson sold 168,000 shares of America Online and new Time Warner common stock, garnering excess of $8.5 million

(h)    Between August 28, 2000 and April 25, 2001, Defendant Kelly sold 470,000 shares of America Online and new Time Warner common stock, garnering in excess of $23 million.

80.    The stock sales set forth in the preceding paragraph were not part of any normal or regular pattern or practice of such sales by the Selling Director and Officers Defendants, but rather were unusual in timing and amount.  For example Defendants Case, Barksdale, Caufield, Kelly, Novack and Pittman had not sold any shares of America Online common stock since October 1999; Defendant Akerson had not sold any shares of America Online common stock since February 1999; and Defendant Colburn had never sold any shares of America Online common stock.

81.    As detailed herein, at the time of these stock sales, each of the Selling Director and Officer Defendants knew or recklessly disregarded, but did not disclose to the market, that

the Company had engaged in the improprieties regarding the accounting schemes detailed

herein, and/or that the Company lacked reasonable and adequate systems of control, oversight

and monitoring of critical financial components of the Company's underlying business. In the

face of the knowledge and/or reckless disregard, the Company lacked and/or failed to enforce

adequate guidelines to prevent the Selling Director and Officer Defendants from collectively

selling hundreds of thousands of shares for hundreds of millions of dollars based upon

undisclosed adverse inside information.

82.    Exacerbating the egregious nature of these insider sales is the fact that in the

period immediately following the Merger, when these sales predominately occurred, the Director

Defendants had authorized and/or acquiesced in the Company's expenditure of over $1.3 billion

of corporate funds for an open market stock repurchase program – telling the investing public

that new Time Warner's common shares were "undervalued." Pursuant to this program, the

Company acquired over 30 million shares of new Time Warner's publicly held stock, further

manipulating and artificially inflating the stock price while these insiders unloaded hundreds of

thousands of shares onto an unsuspecting market.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against All Individual Defendants)

83.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations

as if fully set forth herein.

84.    Each Individual Defendant, because of his or her position as a director and/or

officer or employee of the Company, owed fiduciary duties to the Company and its shareholders

in connection with its operations, management and direction.

85.    To discharge these duties, Individual Defendants were required, among other things to:

(a)    Manage, conduct, supervise and direct the business affairs of the Company, including its subsidiary units, in accordance with applicable state and federal law and rules and regulations;

(b)    Neither violate nor permit any officer, director, agent or employee of the Company, including its subsidiaries, to violate applicable state laws, federal laws, rules or regulations, including but not limited to laws dealing with insider trading and other securities violations;

(c)    Establish and maintain systematic and accurate books and records of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board of Directors, and periodically investigate, or cause independent investigation to be made of, said books and records;

(d)    Maintain and implement an adequate and functioning system of internal financial and accounting controls, such that the Company's financial statements and information would be accurate;

(e)    Exercise supervision over the public statements made and/or issued to the securities markets relating to the Company;

(f)    Remain informed as to the status of the Company's business, conditions, practices and operations, and upon receipt of notice of information of imprudent or unsound practices or operations, make a reasonable inquiry in connection therewith, and take steps to correct such practices or operations and make such disclosures as are necessary to comply with State and Federal securities laws; and

    (g)    Supervise the preparation and filing of any audits, reports or other information required by law and examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of the Company, and make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

86.    The Individual Defendants breached their fiduciary duties to the Company by, *inter alia,* failing to maintain adequate accounting controls and by employing improper accounting and audit practices and procedures, which served to conceal the true condition of the Company and thereby artificially inflated the value of the Company's stock by overstating earnings.

87.    The Individual Defendants owed a fiduciary duty to the Company to supervise the issuance of its press releases and public filings to ensure that they were truthful and accurate and that they conformed with federal and state law. The Individual Defendants further breached their fiduciary duty by failing to properly supervise and monitor the Company's accounting practices and the adequacy of its internal financial controls and audits and by allowing misleading statements and filings to be issued and made.

88.    In addition, the Director Defendants breached their fiduciary duties to the shareholders of the new Time Warner by permitting the Merger to occur, or, at a minimum, to occur at such an unfavorable price and under such unfavorable terms and conditions to the old Time Warner.

89.    The Individual Defendants who improperly sold personal holdings of the Company's securities further breached their duties to the Company and its shareholders.

90.     The Director Defendants have engaged, knowingly or recklessly, in a sustained and systematic failure over the course of many years to exercise their oversight responsibilities to ensure that the Company complied with federal and state laws, rules and regulations and with GAAP to ensure the integrity of its accounting practices and financial reporting.

91.     The Director Defendants who were directors of the Company and who had also served as directors of America Online before the Merger of America Online and old Time Warner were responsible for the wrongful business practices described above, either as knowing participants or by reason of their reckless and abject failure to discharge their oversight responsibilities.

92.     The Director Defendants who were directors of the Company and who had also served on the old Time Warner Board before the Merger were guilty of reckless indifference in investigating the integrity of America Online's business practices before the Merger, particularly in light of the importance of America Online's advertising revenue to the success of the combined company.

93.     All the Director Defendants and Officer Defendants, by action or inaction, countenanced, directed and/or participated in continuation of such wrongful business practices after the Merger and, indeed, permitted the Company to engage in new and other suspect deals which inflated its revenues.

94.     The Audit and Finance Committee Defendants further breached their fiduciary duties by failing to ensure that the Company properly recorded its financial transactions and that its financial reports accurately portrayed the Company's financial structure and condition.

## COUNT II

### CONTRIBUTION AND INDEMNIFCATION
### (Against All Defendants)

95.    Plaintiffs repeat and reallege each and every allegation set forth above.

96.    The Company is alleged to be liable to various persons, entities and/or classes by

virtue of the same facts or circumstances as are alleged herein to give rise to defendants' liability

to the Company.  Moreover, the Company has already agreed, subject to court approval, to pay

*$2.65 billion* to settle claims of class members arising from these actions, and has made

substantial other payments to settle claims of the SEC and the Department of Justice.

97.    The Company's alleged liability and resulting multi-billion dollar payments on

account of the wrongful acts and practices and related misconduct described above arises, in

whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of

defendants as alleged above, and the Company is entitled to contribution and indemnification

from each of the defendants in connection with all such claims that have been, are or may in the

future be asserted against the Company by virtue of defendants' misconduct.

### COUNT III

### UNJUST ENRICHMENT
### (Against Selling Director And Officer Defendants)

98.    Plaintiffs repeat and reallege each and every allegation set forth above.

99.    Each of the Selling Director and Officer Defendants owes and owed a fiduciary

duty of loyalty to the Company that encompasses a duty not to personally financially benefit

from the use of inside, non-public information about the company they served.

100.    The Selling Director and Officer Defendants breached that duty and unjustly enriched themselves as a result of their sale of significant quantities of America Online and/or new Time Warner securities at a time when in the possession of material non-public information.

101.    As a direct and proximate result of their actions, the Selling Director and Officer Defendants were unjustly enriched, and are subject to appropriate legal and/or equitable relief.

## DEMAND FUTILITY

102.    Plaintiffs did not make pre-suit demand on the Company's Board of Directors to pursue this action because such a demand is excused and would have been a futile act for the reasons set forth below:

(a)    The improper business practices and misleading financial reporting, as described above, were longstanding practices at the Company and its predecessor, America Online, spanning several years well known to or consciously disregarded by at least a majority of the Individual Defendants. Such wrongful practices are a direct consequence of defendants' reckless negotiation and approval of the Merger and sustained, systematic failure to ensure that the Company operated its business and affairs with integrity and that its financial reporting truthfully reflected the Company's financial performance. At least one-half of the Company's directors were responsible directly for the wrongful business practices and accounting irregularities that pervaded America Online's affairs before the Merger and carried over to the combined enterprise as detailed herein. These Director Defendants face a substantial likelihood of personal liability to the Company for the damages it has sustained and will sustain in the future as a result of the wrongs described above. As a consequence, they are in an irreconcilable conflict of interest regarding the prosecution of this action, and have a personal material pecuniary interest that would be adversely affected if the claims herein were pursued.

Accordingly, the Company's Board could not exercise the requisite independence necessary to consider a pre-suit demand impartially and in good faith.

(b)    At least a majority of the Director Defendants knew or consciously disregarded repeated "red flag" warnings highlighting the wrongs forming the basis for the claims alleged herein, and not only proceeded to negotiate and approve the Merger terms, but also failed to protect the Company or rectify the wrongful policies and practices complained of herein. In fact, the Director Defendants permitted senior officials of the Company to repeatedly publicly defend the Company's business and accounting practices following the Merger, thereby lulling investors and other persons and entities not privy to information known or available to the Director Defendants into a false sense of confidence about the Company including obtaining shareholder votes to approve the Merger. The Director Defendants countenanced a continuing course of misconduct for which they now face a substantial likelihood of liability. Thus, the Director Defendants could not consider a demand objectively and impartially.

(c)    The Director Defendants herein are accused of conduct that is not subject to ratification or otherwise subject to business judgment protection. The actions of the Board could not have reflected a reasonable exercise of business judgment, thus subjecting the Board members to a substantial risk of personal liability.

103.    In addition to the reasons stated above and throughout this Complaint, detailed below are additional specific reasons with respect to each of the Director Defendants why demand was excused as of the commencement of this litigation, because each such Director Defendant was incapable of adequately considering a shareholder demand.

**Defendant Akerson**

104.    Defendant Akerson was not independent or disinterested and could not have adequately considered a shareholder demand. He was named as a defendant in the federal securities action. Although the securities fraud claims were withdrawn against Akerson, based upon the heightened pleading standards of Rule 9 of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Akerson has knowingly and/or recklessly breached his fiduciary duty to the Company as demonstrated within this complaint. For this reason, and the further reasons stated below, Akerson was not independent or disinterested and could not have adequately considered a shareholder demand.

(a)    Akerson had knowledge, was reckless, or deliberately disregarded information regarding the wrongful accounting schemes alleged within this action. In fiscal years 1999 and 2000, Akerson served as a member of America Online's Audit Committee. During those years he met with E&Y many times to discuss and approve the engagement of the auditors, the annual financial statements, the accounting policies of the Company (which would have included the accounting schemes described above), internal accounting controls, and the scope of annual audits. Based upon America Online's storied past of accounting violations, the Cease and Desist Order, Case's promise to deliver the "Gold Standard" of accounting practices to America Online, and that the continued success of America Online depended on its advertising revenue, the accounting practices and internal controls regarding advertising revenue constituted a major part of discussion and concern for the Audit Committee and the auditor.

(b)    Further, Akerson, was a member of the Audit Committee of AOL prior to the Merger and as a member of the Audit and Finance Committee of new Time Warner after

the Merger. In that capacity, he met with other members of these committees and the auditors to discuss and approve the engagement of the auditors for the fiscal years ended December 31, 2000 and December 31, 2001, as well as the annual financial statements, the accounting policies of the Company (which would have included accounting schemes described above), internal accounting controls, and the scope of annual audits.

      (c)    Additionally, Akerson continued to serve as an Audit and Finance Committee member for the year ending December 31, 2002, and it has been reported that the committee met as many as thirteen times that year. Again, the purpose of such meetings would have been to meet the standards provided in the Company's Audit and Finance Committee Charter. As such, Akerson (and other committee members) had oversight responsibility over the Company's accounting practices and would have discussed such practices with E&Y as a committee member.

      (d)    Additionally, Akerson personally benefited from his breach of fiduciary duty by selling 168,000 shares of his personal holdings of Company stock. Indeed, Akerson pocketed more than $8.5 million in insider trading proceeds by selling large amounts of stock within the Relevant Period.

      (e)    Akerson was also personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the 1999, 2000 and 2001 Annual Reports filed on SEC Form 10-K and the Merger Registration Statement, which contain the admittedly materially false financial statements.

**Defendant Barksdale**

105.    Defendant Barksdale was not independent or disinterested and could not have adequately considered a shareholder demand for the reasons set forth below.

(a)    Barksdale personally benefited greatly from his breach of fiduciary duty by selling 1,852,250 shares of his personal holdings of Company stock. Indeed, Barksdale pocketed more than $91.5 million in insider trading proceeds by selling large amounts of stock at suspicious times. Indeed, in May, June and through July 23, 2002, just before the publication of The Washington Post article, Barksdale sold 334,125,000 shares of his personal holding for a whopping $5,269,690.

(b)    Barksdale was also personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the 1999, 2000 and 2001 Annual Reports filed on SEC Form 10-K and the Merger Registration Statement, which contain the admittedly materially false financial statements.

**Defendant Bollenbach**

106.    Defendant Bollenbach was not independent or disinterested and could not have adequately considered a shareholder demand for the reasons set forth below.

(a)    Bollenbach was personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the 2000 and 2001 Annual Reports filed on SEC Form 10-K, and the Merger Registration Statement which contain the admittedly materially false financial statements.

(b)    Further, Bollenbach, as a member of the AOL Audit Committee for the year ending December 31, 2000 and the new Time Warner Audit and Finance Committee for the year ending December 31, 2001, met with these Committees and the auditors at least another

four times to discuss and approve the engagement of the auditors, the annual financial statements, the accounting policies of the Company (which would have included accounting schemes described above), internal accounting controls, and the scope of annual audits. Based upon America Online's storied past of accounting violations, the Cease and Desist Order, Case's promise to deliver the "Gold Standard" of accounting practices to the Company, and that the continued success of the Company depended on its advertising revenue, the accounting practices and internal controls regarding advertising revenue was a major part of discussion and concern for the audit committee and the auditor.

(c)    Additionally, Bollenbach served as an Audit and Finance Committee member for the year ending December 31, 2002, and it has been reported that the committee met several times that year. Again, the purpose of such meetings would have been to meet the standards provided in the Company's Audit and Finance Committee Charter. As such, Bollenbach had oversight responsibility over the Company's accounting practices and would have discussed such practices with E&Y as a committee member.

**Defendant Case**

107.    Defendant Case was not independent or disinterested and could not have adequately considered a shareholder demand. As the former CEO and Chairman of America Online and the Chairman of new Time Warner after the Merger, Case was clearly not independent due to his executive positions with the Company. Additionally, Case was not disinterested or independent because he was and remains a principal defendant in the federal securities action.

(a)    On August 11, 2004, the federal court denied Case's motion to dismiss in the federal securities action and held that the applicable complaint adequately pled that he knew

that the advertising and commerce revenue stream was considerably more imperiled than was being reported to the shareholders and the public. Indeed, Case "began receiving internal Company reports pointing to a stark reversal of fortune on the horizon," and thus his knowledge was adequately demonstrated. Additionally, the federal court held that Case's personal statement of October 17, 2000, that "I do not think people generally are concerned about our Internet advertising. Our results show that there's no reason to be concerned when it comes to AOL" was actionable, and that the complaint had adequately pled his fraudulent actions under Rule 9 (b) of the Federal Rules of Civil Procedure and the PSLRA. As such, he was clearly not independent or disinterested and could not have adequately considered a shareholder demand.

(b)     Case personally benefited from his breach of fiduciary duty by selling 3,000,000 shares of his personal holdings of Company stock. Indeed, Case pocketed more than $156.7 million in insider trading proceeds by selling large amounts of stock at suspicious times within the Relevant Period.

(c)     Case was also personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the 1999, 2000 and 2001 Annual Reports filed on SEC Form 10-K, and the Merger Registration Statement that contain the admittedly materially false financial statements.

**Defendant Caufield**

108.     Defendant Caufield was not independent or disinterested and could not have adequately considered a shareholder demand. He was named as a defendant in the federal securities action. Although such a securities fraud claim did not proceed against Caufield based upon the heightened pleading standards of Rule 9 of the Federal Rules of Civil Procedure and the

PSLRA, Caufield knowingly and/or recklessly breached his fiduciary duty to the Company as demonstrated within this complaint. For this reason, and the further reasons stated below, Caufield is not independent or disinterested and could not have adequately considered a shareholder demand.

     (a)     Caufield had knowledge, was reckless, or deliberately disregarded information regarding the wrongful accounting schemes alleged within this action. In fiscal years 1999 and 2000, Caufield served as a member of America Online's Audit Committee. During those years, he met with E&Y many times to discuss and approve the engagement of the Auditors, the annual financial statements, the accounting policies of the Company (which would have included accounting schemes described above), internal accounting controls, and the scope of annual audits. Based upon America Online's storied past of accounting violations, the Cease and Desist Order, Case's promise to deliver the "Gold Standard" of accounting practices to the Company, and that the continued success of the Company depended on its advertising revenue, the accounting practices and internal controls regarding advertising revenue was a major part of discussion and concern for the audit committee and the Auditor.

     (b)     Additionally, Caufield personally benefited from his breach of fiduciary duty by selling 150.000 shares of his personal holdings of Company stock. Indeed, Caufield pocketed more than $8.5 million in insider trading proceeds by selling large amounts of stock at suspicious times within the Relevant Period.

     (c)     Caufield was also personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the 1999, 2000 and 2001 Annual Reports filed on SEC Form 10-K, and the Merger Registration Statement which contain the admittedly materially false financial statements.

**Defendant Hills and Mark**

109.    Defendant Hills was not independent or disinterested and could not have adequately considered a shareholder demand. Hills was personally involved in the wrongdoing alleged in this complaint because she also approved, issued and signed the Merger Registration Statement which contains the admittedly materially false financial statements.

110.    Defendant Mark was not independent or disinterested and could not have adequately considered a shareholder demand. Mark was personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the Merger Registration Statement which contains the admittedly materially false financial statements.

**Defendant Novak**

111.    Defendant Novak was not independent or disinterested and could not have adequately considered a shareholder demand. He was named as a defendant in the federal securities action. Although such a securities fraud claim did not proceed against Novack based upon the heightened pleading standards of Rule 9 of the Federal Rules of Civil Procedure and the PSLRA, Novack has knowingly and/or recklessly breached his fiduciary duty to the Company as demonstrated within this complaint For this reason, and the further reasons stated below, Novack is not independent or disinterested and could not have adequately considered a shareholder demand.

(a)    Novack personally benefited from his breach of fiduciary duty by selling 793,000 shares of his personal holdings of Company stock. Indeed, Novack pocketed more than $38 million in insider trading proceeds by selling large amounts of stock at suspicious times within the Relevant Period. Indeed, in March 2002, just months before E&Y's public affirmation that the new Time Warner were accurate and then public exposure

41

of the wrongful accounting schemes by The Washington Post, Novack sold 36,000 shares of his personal holdings for $971,400.

(b)    Novack was also personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the 1999, 2000 and 2001 Annual Reports filed on SEC Form 10-K, and the Merger Registration Statement which contain the admittedly materially false financial statements.

**Defendant Raines**

112.    Defendant Raines was not independent or disinterested and could not have adequately considered a shareholder demand. He was named as a defendant in the federal securities action. Although such a securities fraud claim did not proceed against Raines based upon the heightened pleading standards of Rule 9 of the Federal Rules of Civil Procedure and the PSLRA, Raines has knowingly and/or recklessly breached his fiduciary duty to the Company as demonstrated within this complaint  For this reason, and the further reasons stated below, Raines is not independent or disinterested and could not have adequately considered a shareholder demand.

(a)    Raines had knowledge, was reckless, or deliberately disregarded information regarding the wrongful accounting schemes alleged within this action. In FY 2000, Raines served as a member of AOL's Audit Committee. During that fiscal year he met with E&Y to discuss and approve the engagement of the auditors, the annual financial statements, the accounting policies of the Company (which would have included accounting schemes described above), internal accounting controls, and the scope of annual audits. Clearly, based upon America Online's storied past of accounting violations, the Cease and Desist Order, Case's promise to deliver the "Gold Standard" of accounting practices to the Company, and

that the continued success of the Company depended on its advertising revenue, the accounting practices and internal controls regarding advertising revenue was a major part of discussion and concern for the audit committee and the auditor.

(b)     Further, Raines, as a member of the Audit Committee of AOL for the year ending December 31, 2000 and as a member of the Audit and Finance Committee of new Time Warner for the year ending December 31, 2001, met with the Committee and the auditors to discuss and approve the engagement of the auditors, the annual financial statements, the accounting policies of the Company (which would have included accounting schemes described above), internal accounting controls, and the scope of annual audits.

(c)     Additionally, Raines served as an Audit and Finance Committee member for the year ending December 31, 2002, and it has been reported that the committee met as many as thirteen times that year. Again, the purpose of such meetings would have been to meet the standards provided in the Company's Audit and Finance Committee Charter. As such, Raines had oversight responsibility over the Company's accounting practices and would have discussed such practices with E&Y as a committee member.

(d)     Raines was also personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the 2000 and 2001 Annual Reports filed on SEC Form 10-K, and the Merger Registration Statement which contain the admittedly materially false financial statements.

**Defendant Turner**

113.    Defendant Turner was not independent or disinterested and could not have adequately considered a shareholder demand for the reasons set forth below.

43

(a)    Turner was personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the Merger Registration Statement which contains the admittedly materially false financial statements.

(b)    Additionally, Turner personally benefited from his breach of fiduciary duty with two insider stock sales, on February 15 and May 14, 2001, Defendant Turner sold 1,343,344 shares of new Time Warner common stock, garnering in excess of $68 million.

**Defendant Vincent**

114.    Defendant Vincent was not independent or disinterested and could not have adequately considered a shareholder demand.

(a)    Vincent, as a member of the Audit Committee of AOL for the year ending December 31, 2000 and the Audit and Finance Committee of new Time Warner for the year ending December 31, 2001, met with the Committee and the auditors to discuss and approve the engagement of the auditors, the annual financial statements, the accounting policies of the Company (which would have included accounting schemes described above), internal accounting controls, and the scope of annual audits. Again, based upon the Company's storied past of accounting violations, the Cease and Desist Order, Case's promise to deliver the "Gold Standard" of accounting practices to the Company, and that the continued success of the Company depended on its advertising revenue, the accounting practices and internal controls regarding advertising revenue was a major part of discussion and concern for the audit committee and the Auditor.

(b)    Additionally, Vincent served as an Audit and Finance Committee member for the year ending December 31, 2002, and it has been reported that the committee met as many as thirteen times that year. Again, the purpose of such meetings would have been to meet the

44

standards provided in the Company's Audit and Finance Committee Charter. As such, Vincent had oversight responsibility over the Company's accounting practices and would have discussed such practices with E&Y as a committee member.

(c)    Vincent was also personally involved in the wrongdoing alleged in this complaint because he also approved, issued and signed the Merger Registration Statement which contains the admittedly materially false financial statements.

## Action by the Board as a Whole

115.    Additionally, the Board has taken and/or authorized certain actions that further demonstrate their lack of independence and disinterestedness. Such actions include the following:

(a)    As early as August 8, 2002, certain shareholders of new Time Warner, began making formal demands on the Board to, *inter alia*, "immediately undertake a thorough investigation of specific events of questionable and potentially improper or illegal accounting for advertising revenue committed by employees of the AOL preceding and following the merger between AOL, and Time Warner" and to "cause the Company to commence legal proceedings against each of the Company's directors during the last three years…"

(b)    As noted below, despite the passage of as much as three years since each of the various shareholder demands, none of the demanded action has been implemented or undertaken by the Company or the Board or any members of the Board. Instead, the Board chose from among its then-existing members a so-called "Demand Committee" to whitewash the defendants' activities as described herein, in an attempt further to delay and frustrate the prosecution of new Time Warner's claims. Such Demand Committee (constituted from among

45

the Director Defendants named in this litigation) has effectively aided and abetted the defendants in the continued cover-up of all defendants' wrongdoing, and has acted not in new Time Warner's best interests, but solely to help the defendants' evade ultimate accountability to new Time Warner. This conduct is compelling evidence that the Board is not exercising any business judgment in the expeditious and vigorous pursuit of any and all claims new Time Warner may have against the Director Defendants, former officers and directors, and/or others who have damaged new Time Warner. The conduct is also evidence that the Board, and its consultants, have engaged in a prolonged campaign to whitewash and ignore the misconduct of upper management of America Online and new Time Warner, and to cover-up the specific acts and failures to act by the Individual Defendants, and the members of new Time Warner's Audit Committee of the Board, and/or the failure of the remaining Director Defendants – in the face of repeated red flags – to ensure that new Time Warner had in place adequate and effectual governance and compliance controls and systems over management, and the information systems necessary to ensure such essential and proper Board control of management required to comply with their fundamental fiduciary duties.

(c)     Further, the facially deficient nature of the "Demand Committee," both in composition and in the investigative procedures and processes it pursued, as well as in the expenses it incurred, represent a further waste of new Time Warner's corporate assets, estimated to be in the millions of dollars.

(d)     The abject failure of the Director Defendants or any other officers or agents of the Company to act in any overt manner in response to such demands further demonstrates and supports plaintiffs' contention that demand on the Board was futile and excused under the circumstances described herein.

(e)      The Selling Director and Officer Defendants have personally financially benefited thereby by more than $600 million.  By taking no action whatsoever against those individuals, the Director Defendants have thus to date and continue to prolong and worsen the very cover-up of wrongdoing that resulted in the foregoing shareholder lawsuits and the shareholder demands described above.

(f)      The payment of $2.65 billion dollars to settle the securities class action claims against the Company and the Individual Defendants further underscores the culpability of the Director Defendants and their incentive to take no action that could cause them to be forced to compensate and reimburse the Company for the grievous injuries that it has and will continue to suffer as a result of their actions.

(g)      In practical terms, new Time Warner's Board would not cause the Company to sue its own members.

(h)      The actions and failures to act by the members of new Time Warner's Board, including the insider selling described herein, amount to a material and substantial waste of corporate assets and a blatant misuse of confidential, corporate information not available to the public at large.  Such waste of assets and misuse of corporate information for personal benefit cannot be blessed by the Board or by any committee thereof and, as such, these activities are not capable of ratification in the context of either the purported investigations of the new Time Warner shareholder demands by the "Demand Committee" and/or deciding what the appropriate course of action is with respect to any previously commenced derivative litigation filed without shareholder demands upon new Time Warner's Board.

(i)      The Board approved the filing of a motion to dismiss in the federal securities action that supported and was filed on behalf of many of the Individual Defendants.

47

In fact, new Time Warner filed a motion to dismiss on its own behalf and for certain Individual Defendants. The interests of the Company clearly conflict with the Individual Defendants.

(j)    The Audit and Finance Committee has refused to terminate E&Y as the Company's auditor. It remains as new Time Warner's auditor despite its knowledge and involvement in the accounting schemes and manipulations that are or were the subject of this action, the federal securities action, the state securities actions, the Department of Justice and SEC investigations and the financial restatements.

116.    For the foregoing reasons, new Time Warner's Board is incapable of and has otherwise relinquished any right to exercise the independent and informed business judgment normally accorded to a disinterested and properly functioning board of directors, and this litigation should be allowed to proceed on behalf of new Time Warner and for its benefit.

117.    In addition to the effective and wrongful refusal to take remedial action with respect to the various shareholder demands made upon the new Time Warner Board, it is clear that demand is excused in this case because it is futile. As detailed herein, the Director Defendants and senior management of the Company have consistently and repeatedly breached their most fundamental fiduciary duties and wasted new Time Warner's assets. Specifically, the Director Defendants, and especially Defendants Akerson, Caufield, Raines, Bollenbach and Vincent in their capacity as members of the Audit Committees and/or Audit and Finance Committee, knew or consciously disregarded that America Online's financial reports regarding its online advertising revenue were artificially inflated and false. The remaining Director Defendants, based on their receipt of repeated red flags and other warnings, knew or consciously disregarded that the oversight, monitoring and information systems in place at the Company were inadequate and ineffectual, a problem dramatically exacerbated due to the diverse and

48

dramatically disparate corporate cultures, jealousies, biases, attitudes, and approaches to financial accounting manifest at new Time Warner, and its subsidiaries or divisions, following the Merger. Thus, the new Time Warner Board has consistently demonstrated a conscious disregard for the interests of new Time Warner's stockholders, and has shown a gross unwillingness to protect new Time Warner's interests by recovering monies from its current and former officers and directors and others who have damaged the Company.

118. The Director Defendants cannot be expected to exercise disinterested independence in evaluating a demand to institute suit for new Time Warner, because their own defense to that suit will be the concession that members of the Board either (i) knowingly or with conscious disregard acted or specifically failed to act, allowing the misconduct to continue quarter after quarter at both America Online and/or, following the Merger, at new Time Warner, and/or in fact, personally financially benefited thereby through insider sales of over 12 million shares of stock; or (ii) in the face of repeated red flags, still failed to ensure the Company had in place fundamental and effective oversight, monitoring and information systems and controls. The authorization of a suit would, as the Director Defendants know, have either revealed their personal misconduct or required the advancement of an ignorance defense.

119. The Director Defendants are also unwilling to authorize such a lawsuit, because it would be tantamount to self-incrimination. Litigation of this action will reveal that the Board collectively and through the members thereof, was a participant in the manipulation of new Time Warner's earnings, assets and net worth, thereby damaging the directors personally, professionally and financially.

120.    Given the existence of such conflicts of interest that cannot be eliminated by the sham "Demand Committee" or otherwise, it is unlikely the Board will authorize any effective or appropriate action.

121.    As a result of defendants' breaches, the Company has been the subject of major securities fraud class action lawsuits by defrauded investors, which the Company recently settled for $2.65 billion dollars (subject to the court's approval), and the SEC and Justice Department investigations described above, which collectively resulted in massive penalties and payments to restitution funds, has lost market share, has had its reputation in the business community irreparably tarnished and has thus been seriously damaged.

122.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs demand judgment as follows:

A.    Directing Individual Defendants to account to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.    Requiring Selling Director and Officer Defendants to return to the Company all proceeds from their improper sales of the Company's securities, including sales of securities of America Online prior to the consummation of the Merger, and all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to the Company;

C.    Directing defendants to establish and maintain effective compliance programs to ensure that the Company's affiliates and employees do not engage in wrongful and illegal practices;

D.    Directing defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of defendants' culpable conduct; and

E.    Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses.

F.    Granting such additional and different relief as the interests of justice or equity may require.


Dated: April 19, 2006                              BARRACK, RODOS & BACINE


                                                   By: _____
                                                   Regina M. Calcaterra (RC-3858)
                                                   170 E. 61st Street
                                                   Second Floor
                                                   New York, NY  10021
                                                   Telephone:  (212) 688-0782
                                                   Fax:  (212) 688-0783

                                                           and

                                                   Daniel E. Bacine
                                                   Mark R. Rosen
                                                   Chad A. Carder
                                                   Lisa M. Lamb
                                                   Beth R. Targan
                                                   3300 Two Commerce Square
                                                   2001 Market Street
                                                   Philadelphia, PA  19103
                                                   Telephone: (215) 963-0600
                                                   Fax: (215) 963-0838

                                                   **Counsel for City of Philadelphia Board
                                                   of Pensions and Retirement**

ABBEY SPANIER RODD ABRAMS
    & PARADIS LLP
212 East 39th Street
New York, NY  10016

**Counsel for Plaintiff Lewis Wilder**


THE BRUALDI LAW FIRM
Suite 1515
29 Broadway
New York, NY  10006

**Counsel for Plaintiff North Border
Partners**